UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

```
----------------------------------------------------------X
IN RE:                                          :
                                                :        Chapter 11
        DENNIS P. SORGE,                        :        No. 16-04142-5-JNC
                                                :
            Debtor.                             :
----------------------------------------------------------X
FEDERAL INSURANCE COMPANY,                      :
GREAT NORTHERN INSURANCE COMPANY,               :
and PACIFIC INDEMNITY COMPANY,                  :
                                                :        ADVERSARY PROCEEDING
            Plaintiffs,                         :
                                                :        Adv. Proc. No. 16-00168
        -against-                               :
                                                :
DENNIS P. SORGE,                                :
                                                :
            Defendant.                          :
----------------------------------------------------------X
```

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**</u>

Plaintiffs Federal Insurance Company, Great Northern Insurance Company, and

Pacific Indemnity Company (collectively, "<u>Federal</u>"), by and through the undersigned attorneys,

submits this Memorandum of Law in Opposition to Defendant's Motion to Dismiss, filed on

November 15, 2016 (the "<u>Motion to Dismiss</u>").

**INTRODUCTION**

This case represents a clear-cut and prototypical illustration of a non-

dischargeable $7.1 million debt.  After four (4) years of litigation and an eleven (11) week trial, a

jury held the Debtor liable for that amount, finding that he actually defrauded his employer,

Federal, and wrongfully breached his fiduciary duties to Federal by abusing his authority to

authorize, recommend and facilitate the payment of homeowner insurance claims that he knew to

be fraudulent.  Allowing the Debtor to discharge and escape financial responsibility for his intentionally wrongful conduct, as found by a jury of his peers, would fly in the face of not only Section 523, but of the bankruptcy process.

## STATEMENT OF FACTS

The Debtor was formerly employed by Federal as one of its most senior claims adjusters.  On March 5, 2012, Federal sued the Debtor in the Southern District of New York in an action styled *Federal Insurance Co., et al. v. Paul H. Mertz, Jr., et al.*, 12-cv-1597-NSR (S.D.N.Y.) (the "New York Action").  Federal's Complaint, attached as Exhibit A to Federal's Amended Complaint in this action, describes the Debtor's knowing role in schemes to inflate and falsify the scope and amount of covered repairs to fire-damaged homes in Connecticut and Westchester County, New York and the Debtor's knowing overpayment of those fraudulent claims.  As the direct result of the Debtor's misconduct, between 2005 and 2010, Federal paid nearly $10,000,000.00 to settle fraudulent claims.  [Comp., Ex. A]

On December 17, 2013, the District Court in the New York Action issued an order attaching annuity and brokerage accounts held by the Debtor at JPMorgan Chase Bank (the "Attachment Order").  [Am. Comp., Ex. C]  The Attachment Order remains in place.  The accounts referenced in the Attachment Order represent the majority of, though not all of, the Debtor's assets.  (Declaration of David T. McTaggart dated December 15, 2016 ("McTaggart Dec.") ¶ 4).

At the conclusion of the evidence after eleven (11) weeks of trial, the District Court in the New York Action charged the jury regarding Federal's claims against the defendants (the "Jury Charge").[1]  [McTaggart Dec., Ex. 5]  Portions of the Jury Charge are relevant in

---

[1] Although the Jury Charge is not an Exhibit to Federal's Amended Complaint in this action, "[i]t is well settled that a court may take judicial notice of related pleadings and proceedings in other courts" in considering a Rule 12(b)(6)

response to the Debtor's Motion to Dismiss.  First, the District Court instructed the jury on the elements of Federal's fraud and breach of fiduciary duty claim.  [*Id.*, pp. 19, 22]  Second, the District Court noted that "[i]t is <u>undisputed</u> that Sorge was an employee of Plaintiffs and therefore he owed Plaintiffs undivided and unqualified loyalty and was not permitted to act in any manner contrary to the interests of the employer."  [*Id.* p. 22 (emphasis added)]  Third, the District Court summarized some of the contentions made by Federal and the Debtor concerning the fiduciary claims:

> Plaintiffs claim that Sorge did not act in good faith or in the best interests of Plaintiffs when he: (1) adjusted the insurance claims involved in this case in a dishonest manner; (2) solicited homeowners to hire the Mertz Company to repair and do demolition work at their fire damaged houses at the same time that the Mertz Defendants were Plaintiffs' building damage consultants; (3) made material false and fraudulent statements to and concealed material facts from Plaintiffs concerning the insurance claims involved in this case; (4) authorized, recommended or facilitated claim payments on the basis of fraudulent estimates knowing that the estimates were fraudulent and that the Mertz Defendants would profit from those payments; and (5) caused Plaintiffs to pay bills resulting from Thomas Parisi's work on rebuilding and renovating homes as claim expenses.  Plaintiffs claim that as a result of this breach, Plaintiffs sustained damages.  Sorge denies breaching his fiduciary duty to Plaintiffs and claims that (1) he did not conceal Mertz' dual role as Plaintiffs were aware that Mertz worked both as Plaintiffs' consultant and as a general contractor for the insureds and allowed to continue; (2) Mertz' repair estimates were not fraudulent, or if they were, he did not know that they were; (3) he did not have authority to approve estimates; and (4) he did not financially profit from his alleged role.

[*Id.* p. 23; *see also* Am. Comp. ¶ 26]

---

motion.  *In re NC & VA Warranty Company, Inc.*, 554 B.R. 110, 120 (Bankr. M.D.N.C. 2016) (citing *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir.1989) (taking judicial notice of guilty pleas in related criminal case, and *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir.1979) ("federal courts ... may take notice of proceedings in other courts, both within and without the federal system, if those proceedings have a direct relation to matters at issue").

On July 8, 2016, the jury answered detailed interrogatories and rendered a verdict (the "Verdict") finding the Debtor liable to Federal as follows:

| INSURED | CLAIM | AMOUNT | INTEREST AS OF 8-09-16 | TOTAL |
|---------|-------|--------|------------------------|-------|
| Berlin | Breach of Fiduciary Duty | $ 328,358.77 | $ 301,595.15 | $ 629,953.92 |
| Fuller | Breach of Fiduciary Duty | $ 536,076.74 | $ 472,362.32 | $ 1,008,439.06 |
| Iddison | Breach of Fiduciary Duty | $ 545,506.79 | $ 480,791.82 | $ 1,026,298.61 |
| Iddison | Fraud | $ 1,432,513.81 | $ 1,262,570.92 | $ 2,695,084.73 |
| McAlley | Breach of Fiduciary Duty | $ 699,107.66 | $ 696,986.02 | $ 1,396,093.68 |
| Palaia | Breach of Fiduciary Duty | $ 559,613.24 | $ 407,514.16 | $ 967,127.40 |
| Talbot | Breach of Fiduciary Duty | $ 262,298.59 | $ 212,237.03 | $ 474,535.62 |

Accordingly, the Debtor was adjudicated liable for defrauding Federal and of breaching his fiduciary duty owed to Federal by, among other things, causing Federal to pay claims that he knew were fraudulent and that would financially benefit him. In addition, the Debtor was found to be a faithless servant under New York law, and required to forfeit his compensation during the period of faithlessness.[2] [Am. Comp. ¶¶ 27-29 & Ex. B; McTaggart Dec. ¶¶ 8-10]

### NATURE OF THE CASE

In response to the Verdict and before the District Court in the New York Action had reduced the Verdict to judgment or assessed costs against him, the Debtor filed this bankruptcy case on August 9, 2016. On October 13, 2016, this Court entered an Order modifying the automatic stay so that the District Court in the New York Action could enter judgment against, and assess costs against, the Debtor. [D.E. 49, 51]

---

[2]  Included in the equitable relief due a party that successfully asserts a claim under New York's faithless servant doctrine is a constructive trust imposed upon all ill-gotten gain. The trust includes all forfeited compensation. This was the basis upon which the District Court attached the Debtor's IRA accounts into which he had transferred portions of his compensation. The Debtor, for the first time, now disputes that a constructive trust was imposed on his forfeited compensation in his IRA accounts by reason of his faithless servant liability. That issue is being presented to the District Court to resolve in settling the judgment. This matter is further discussed in Section ___ below at ____.

4

The Debtor filed his proposed Plan of Reorganization (the "Plan") on November 3, 2016.  [D.E. 59]  On November 7, 2016, Federal filed its Complaint in this Adversary Proceeding.  Federal then filed its Amended Complaint on November 9, 2016 to correct a typographical error in the case caption.  Federal's Amended Complaint incorporates its Complaint in the New York Action and the Verdict.  Federal's Amended Complaint asserts the following claims for relief:

> Count 1 – to determine that the Fraud Debt is not dischargeable pursuant to Sections 523(a)(2) and (a)(4) because the Debtor actually defrauded Federal.
>
> Count 2 – to determine that the Fiduciary Debt is not dischargeable pursuant to Section 523(a)(4) because the Debtor committed fiduciary defalcation or embezzlement.[3]
>
> Count 3 – if not addressed by the District Court in the New York Action, to determine that the Debtor holds all compensation and ill-gotten gains in trust for Federal.
>
> Count 4 – to determine that the Chase Account Trust Funds and Annuity Trust Funds are not property of the Debtor's bankruptcy estate because he holds them in trust for Federal, and that such funds are not subject to any exemptions available to the Debtor.

In lieu of answering the allegations contained in Federal's Amended Complaint, the Debtor filed the Motion to Dismiss on November 15, 2016 and his corresponding Memorandum of Law in November 18, 2016.  On December 2, 2016, Federal filed a Motion to Dismiss the Debtor's bankruptcy case for cause pursuant to Section 1112(b).  [D.E. 78]

## ARGUMENT

### I.    Standard of Review

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a party's claim; in doing so, the court should accept all well-pleaded facts as true

---

[3] The Debtor's Motion to Dismiss does not address Federal's claim for nondischarge of the Verdict based on the Debtor's embezzlement.  For that reason, Federal does not address that claim.

and view those facts in the light most favorable to the plaintiff. *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011). Under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), a claim is not required to contain "detailed factual allegations," but rather needs only to contain "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570.

*Twombly*'s plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Twombly*, 550 U.S. at 556. A complaint survives a motion to dismiss where its factual allegations, when accepted as true, would "raise a right to relief above the speculative level, thereby nudging [the plaintiff's] claims across the line from conceivable to plausible." *Bala v. Virginia Dep't of Conservation & Rec.*, 532 Fed. Appx. 332, 333 (4th Cir. 2014) (internal citations omitted).

## II.    The Purpose of Section 523(a)

"[T]he bankruptcy code presumes that, at the conclusion of the bankruptcy proceeding, the debtor's obligations will be discharged. However, in clear recognition of the fact that certain debts arise from obligations too important, or, in certain instances, too blameworthy to be voided, Congress also has delineated several categories of debt which may never be discharged." *In re Cobham*, 551 B.R. 181, 189 (E.D.N.C. 2016). "§ 523(a)'s purpose" is "preventing debtors [] from avoiding, through bankruptcy, the consequences of their wrongful conduct." *In re Ellison*, 296 F.3d 266, 271 (4th Cir. 2002). "The Code is intended to afford relief only to an honest but unfortunate debtor. Thus, perpetrators of fraud…are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Pleasants*, 219 F.3d 372, 375 (4th Cir. 2000). Section 523 is Congress' statement that it does not favor "giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Id.*

6

**III.      The Debtor Cannot Relitigate the Jury's Finding that the Debtor Defrauded Federal**

"In *Grogan v. Garner*, 498 U.S. 279, 284 (1991), the Supreme Court concluded explicitly that principles of collateral estoppel apply in dischargeabilty proceedings in bankruptcy." *In re Ogden*, 2015 WL 9412746, *2 (Bankr. E.D.N.C. 2015) (quoting *Pahlavi v. Ansari*, 113 F.3d 17, 19 (4th Cir. 1997)).   "[C]ollateral estoppel forecloses the relitigation of issues of fact or law" previously decided against a party.   *In re Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2006).

"Under federal common law, a federal diversity judgment is to be accorded the same preclusive effect that would be applied by the state courts in the state in which the federal diversity court sits." *In re McVay*, 461 B.R. 735, 741 (Bankr. C.D. Ill. 2012) (citing *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) and *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)).   Here, New York's version of collateral estoppel applies, since the jury's verdict was entered in the State of New York.   "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455-56 (1985)).

There is no question as to the second element.   Sorge actively participated in the New York Action for four years and in the jury trial for eleven weeks.   As shown below, the necessary elements and facts under Section 523(a)(2) and (a)(4) are established by the Verdict in the New York Action.   In reaching that conclusion, this Court may, of course, review the Verdict itself.     Additionally, under the "deductive approach," explained in both COLLIER ON BANKRUPTCY and *In re Kates*, 485 B.R. 86, 102 (Bankr. E.D. Pa. 2012), this Court should review pleadings, testimony, evidence, and other materials in the New York Action and infer

7

from the Verdict those facts and issues necessarily decided by the jury in the Verdict.  In the "deductive approach":

> the bankruptcy court starts with the ultimate conclusions of the first court (which usually are not in dispute) – for example, that the court entered judgment in the creditor's favor on a particular cause of action.  The court next attempts to reconstruct inferentially the necessary foundations of the prior decision.  If that reconstruction process is successful, the court then compares those foundational elements of the § 523(a) nondischargeability asserted by the plaintiff…Or the bankruptcy court may consider additional materials from the first proceeding, such as pleadings, briefs and jury instructions, in an effort to ascertain what issues were actually litigated before and necessarily decided by the prior court.

*Kates*, 485 B.R. at 102.  Accordingly, in addition to the jury's specific responses in the Verdict, this Court may infer those facts necessary to the jury's decision from Federal's Complaint, the Jury's Charge, and evidence in the New York Action.  As shown below, those materials make clear that Federal has not only stated its claim pursuant to Rule 12(b)(6), but that the jury verdict establishes the essential elements of Sections 523(a)(2) and (a)(4).

**IV.    Federal's Count II States a Valid Claim to Exempt the Jury Verdict From Discharge Pursuant to Section 523(a)(4) as Fiduciary Defalcation or Embezzlement**

After the District Court noted that it was "undisputed" that the Debtor "owed [Federal] undivided and unqualified loyalty and was not permitted to act in a manner contrary to" its interests [McTaggart Dec. Ex. 5, p. 22], and after the jury found that the Debtor breached his fiduciary duty on six separate insurance claims and awarded damages in excess of $5,000,000 including interest [Am. Comp., Ex. B], the Debtor now attempts to parse the definition of "fiduciary" to escape the result of the New York Action.  However, as shown below, applicable Fourth Circuit authorities confirm the preclusive effect of the Verdict and explain that the any nuance to the definition of "fiduciary" for purposes of Section 523(a)(4) nonetheless includes the Debtor's fiduciary relationship as found by the jury.

      **a.**    **The jury's verdict collaterally estops the Debtor and establishes a fiduciary defalcation or embezzlement**

      The Debtor now claims that he is not a fiduciary of Federal.  This Court should not countenance that argument at this stage because Debtor is collaterally estopped from making it.

      The Debtor never disputed his fiduciary duty to Federal in the New York Action. [McTaggart Dec. Ex. 5, p. 22]  Then, the Verdict found the Debtor liable to Federal for breach of fiduciary duty in connection with his administration of, and misuse of, Federal's assets on six separate insurance claims.

      The District Court *specifically held* that the basis of Federal's fiduciary claims was the Debtor's *fraudulent conduct involving his control and sway over Federal's money*. Specifically, in addressing the measure of damages, the Court said:

> [W]here the parties claim fraud is the fiduciary's misconduct, the measure of damage is the actual pecuniary loss sustained as the direct result of the wrong. After reviewing similar cases and hearing significant testimony in this case, the Court finds that the [fiduciary] violation [alleged against the defendants] is more akin to the latter category of misconduct (i.e., fraud), and damages should be limited to out-of-pocket loss, which is the actual pecuniary loss sustained as the direct result of the [fiduciary] wrong.

Draft Charge dated June 29, 2016, at 35.  [McTaggart Dec., Ex. 4]

      The District Court's charge to the jury reflected this as quoted on page 3 above. The District Court also specifically instructed the jury that "[i]n order to sustain a claim of breach of fiduciary duty…, Plaintiffs must prove…(1) the existence of a fiduciary relationship…" the breach of which was based on fraudulent conduct.  For six separate insurance claims, the jury responded "YES" to the question of whether "Dennis Sorge breached his fiduciary duty to the Plaintiffs."  [Am. Comp, Ex. B]

In *Pahlavi v. Ansari*, the Fourth Circuit held that a prior finding of the existence of a fiduciary relationship among the creditor and the debtor conclusively established that the debtor "was acting in a fiduciary capacity" for purposes of Section 523(a). 113 F.3d at 19-21. There, Pahlavi sued Ansari in state court alleging fraud and breach of fiduciary duty. Ultimately, a default judgment was entered against Ansari as a sanction for inappropriate discovery tactics. *Id.* at 18. However, before the default judgment was entered, "the state court issued an order expressly finding that Ansari acted in a fiduciary capacity." *Id.* at 20. When Ansari filed a bankruptcy case, Pahlavi sought to determine that the default judgment was nondischargeable. The Fourth Circuit affirmed the lower courts' holding the state court's finding conclusively established the fiduciary element of Section 523(a)(4).

As the Fourth Circuit did in *Pahlavi*, this Court should find that the Verdict, and the Debtor's failure to dispute the issue, conclusively establishes the Debtor's fiduciary capacity and prevents the Debtor from seeking to relitigate that element.

**b.     The distinction between the common law meaning of "fiduciary" and that applicable to Section 523(a)(4) is not meaningful on these facts because the Debtor's fiduciary relationship with Federal falls within both definitions**

Even if he is heard to relitigate this issue, the Debtors' single argument is unavailing. That is because the Debtor's relationship with Federal and the Verdict conclusively establish his "fiduciary capacity" under Section 523 as well as under New York law.

"'Fiduciary,' as used in the bankruptcy code, is a term of art, which refers to trust-like relationships. Broadly, these relationships fall into two categories: express or technical trusts." *Cobham*, 551 B.R. at 193 (internal citations omitted). "The existence of a technical trust relationship requires an analysis focused on the substance of the parties' relationship." *Id.* Contrary to the Debtor's attempt starkly to contrast Section 523(a)'s reference to "fiduciary capacity" and a state law fiduciary standard, in *Cobham*, Judge Flanagan held that "[r]eliance on

10

state law…is both necessary and appropriate in analyzing defendant's status as a fiduciary." *Id.* at 196 (rejecting the debtor's argument "that reliance on state law in conducting a fiduciary analysis is misplaced").  Indeed, the two-part test utilized by Judge Flanagan to determining whether a "technical trust" and "fiduciary capacity" existed was (1) whether the debtor's relation to the creditor were recognized as a fiduciary relationship under state law and (2) whether the debtor "voluntarily accepted" that fiduciary obligation.  *Id.* at 194-96 ("the technical trust relationship that gives rise to fiduciary obligations in this and other cases, also permits reference to state law to determine the obligations voluntarily accepted by the putative fiduciary.").

In *Cobham*, the debtor, a director of related dental practices, was sued by the practices and a co-director for breach of fiduciary duty relating to "unauthorized loans" or "unauthorized distributions."  *Id.* at 185.  Following trial, the bankruptcy court entered a judgment finding that the debtor "breached her fiduciary duty."  *Id.* at 186.  When the debtor later filed a bankruptcy case, the practice sought to declare the judgment debt nondischargeable.  *Id.* at 187.  The bankruptcy court agreed with the creditor.  On appeal, the debtor raised precisely the argument the Debtor now attempts to advance: "that reliance on state law in conducting a fiduciary analysis is misplaced" so that collateral estoppel does not apply.  *Id.* at 196.

Judge Flanagan held that "the Bankruptcy Court's judgment preclude[d] litigation of defendant's status as a fiduciary under the bankruptcy code."  *Id.* at 195.  First, Judge Flanagan noted that the state law judgment "necessarily required to parties to litigate defendant's director status under North Carolina law."  *Id.*  Next, Judge Flanagan assessed "the substance of the parties' relationship" to ascertain the "obligations voluntarily accepted by the debtor."  *Id.* at 194.  On that point, a technical trust relationship was easily found based on the debtor's role as a

director called for her "to hold corporate property and power in trust, and manage both for the benefit of the corporation." *Id.* at 195.

The test announced in *Cobham* confirms that the Verdict in the New York Action "preclude[s] litigation of [the Debtor's] status as a fiduciary under the bankruptcy code." *Id.* As in *Cobham*, the jury expressly found the existence of a state law fiduciary duty owed by the Debtor to Federal. In assessing the "substance of the parties' relationship," the Debtor's role and responsibility as a Federal claims adjuster is similar to the debtor in *Cobham*, where the Debtor was required to "hold corporate property" (Federal's funds) and "manage [it] for the benefit of the corporation" (by paying valid insurance claims under his authority). The Verdict for breach of fiduciary duty is based on the Debtor's fraudulent misapplication of Federal's funds which were within his control, authority, and discretion. Accordingly, the test very recently announced in *Cobham* confirms the Debtor's fiduciary capacity.

Similarly, in *In re Golden*, 54 B.R. 957, 964 (Bankr. D. Mass. 1985), the Court held that "fiduciary capacity within the meaning of Section 523(a)(4) may be found in an employment relationship." It went on to find non-dischargeable a debt that arose from the Debtor's misuse of his employment position to make payments to a vendor in exchange for kickbacks. The Court explained its finding of fiduciary defalcation as follows:

> While at Compugraphic, Golden occupied a position of trust, was in control of corporate property, and was given responsibility for the maintenance and disbursement of corporate funds to vendors. Over the course of his 27 months at Compugraphic, Golden received in excess of $10 million for use in the CIS department. He misapplied substantial amounts of these funds, and at least $104,113 of Compugraphic's corporate funds went directly to Golden in the form of "kickbacks" from Data. Indeed, Golden was only able to set this train of events resulting in unauthorized, exaggerated, false invoicing and kickback because of the level of his authority in Compugraphic and confidence and trust that the company placed in him.

*Golden*, 54 B.R. at 964. The jury found that Sorge engaged in the same sort of misconduct.

The Debtor's "fiduciary capacity" is also supported by the long-standing Fourth Circuit interpretation of that term. *Hamby v. St. Paul Mercury Indemn. Co.*, 217 F.2d 78 (4th. Cir. 1954). In *Hamby*, the Fourth Circuit explained that a "fiduciary" capacity for purposes of Section 523(a)(4) "arises whenever the property of one person is placed in charge of another." *Id.* at 80. "Certainly there can be no question as to the existence of the fiduciary capacity in a case where the agent has been entrusted with money to be used for a specific purpose." *Id.* The Fourth Circuit's straight-forward definition perfectly describes the relationship among the Debtor and Federal upon which the Verdict was based. Federal entrusted the Debtor to pay significant amounts of Federal's money on his own approval and to recommend payment to his supervisors, for the specific purpose of resolving insurance claims for which he was the claims adjuster. This relationship establishes a "fiduciary capacity" under Section 523(a)(4).

In his Memorandum of Law, the Debtor misapplies and overstates the language from the *York* decision from the District Court for the Eastern District of North Carolina. 205 B.R. 759 (E.D.N.C. 1997). In *York*, Judge Howard correctly noted that "a fiduciary relation has been found to exist only where there is a technical or express trust, and not where a trust is imposed because of the very act of wrongdoing out of which the contested debt arose." *Id.* at 763. The Debtor contends that Federal has not alleged a "technical or express trust." But, as shown above, Judge Flanagan's detailed analysis in *Cobham* defines the scope of a "technical trust" as including the voluntary acceptance of state-law fiduciary obligations. Accordingly, the magic words "technical or express trust" create no obstacle.

Moreover, Judge Howard's language that a fiduciary capacity does not exist "where a trust is imposed because of the very act of wrongdoing out of which the contested debt

arose" is inapplicable on these facts. *Id.* This limitation only clarifies that state law or common law constructive trusts, which are imposed after a bad act has occurred to preserve wrongfully obtained property, are not sufficient in and of themselves to create "fiduciary capacity" pursuant to Section 523(a)(4). Rather, the fiduciary relationship must have pre-existed the wrongful conduct. *Id.* ("It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankruptcy has become chargeable as a trustee ex maleficio. He must have been trustee before the wrong and without reference thereto. The language would seem to apply only to a person who was already a fiduciary when the debt was created."). Debtor's fiduciary capacity is based upon his longstanding employment with Federal, his $500,000 and then $1,000,000 settlement authority, and the fiduciary facet of the Verdict is based upon a breach of that pre-existing and undisputed fiduciary duty.

### c. In the alternative, Federal has pled ample facts in support of its claim that the Debtor was a fiduciary of Federal

Were this Court to look beyond the preclusive effect of the Verdict's specific finding of the Debtor's fiduciary relationship with Federal, Federal's claims are not subject to dismissal because it has pled amble facts to support that finding by this Court. The Debtor's Memorandum of Law characterizes Paragraph 43 of Federal's Amended Complaint as the "sole allegation…about Sorge being a fiduciary." [Memo. of Law. p. 5] This is incorrect.

First, the Debtor ignores following fact allegations in the Amended Complaint:

- "Sorge was a General Adjuster, which is a designation for Federal's most senior property claims adjusters. In that capacity, Sorge was responsible for adjusting large property damage claims…As a General Adjuster, Sorge had substantial involvement and authority with respect to the adjustment and payment of these claims." [¶ 15]

- "If a claim was within Sorge's authority, which was $500,000 and then $1 million during the relevant period, he could settle it without further approval. If the claim exceeded his authority, payment had to be approved by a higher ranking Claims employee. However, Sorge remained the line adjuster, the eyes and ears of those above him. As such, Federal

14

relied on Sorge to determine, among other things, the cause of the loss, the scope of the covered damage, and the fair amount Federal should pay to settle covered loss.  His reports and recommendations to his superiors were the basis upon which Federal paid millions of dollars to settle claims that were assigned to Sorge." [¶ 16]

- "Between 2005 and 2011, Sorge routinely authorized and/or recommended claim payments on the basis of Mertz's fraudulent estimates…"  [¶ 22]

- Ultimately, Federal paid its insureds more than $20 million to settle the eight insurance claims identified in the New York Action Complaint, including more than $10 million to demolish and repair the fire-damaged property based on the Mertz estimates.  The insureds, in turn, paid Mertz approximately $9.3 million from that amount for work that Mertz did at their homes.  Mertz, in turn, shared the insurance proceeds with Sorge through kickbacks." [¶ 23]

Second, the Debtor looks past the detailed allegations of Federal's Complaint in the New York Action, incorporated into Federal's Amended Complaint in this action by reference.  [*Id.* ¶ 3, Ex. A]  Federal's Complaint in the New York Action contains forty-eight pages of allegations describing the Debtor's role at Federal and the Debtor's scheme to defraud and divert money from Federal, and breach his duty.  The following are illustrative, but not exclusive, factual allegations as to the Debtor's significant authority, control of funds, and duty to manage claims payments in Federal's best interest:

- "Sorge's responsibilities included assessing claims made under Chubb policies, making recommendations with respect to settlement of those claims, and making claim payments within the authority granted him.  Among other things, this included: (a) investigating the nature and extent of a loss giving rise to the insured's claim; (b) establishing the existence and extent of coverage for the loss under the governing insurance policy; (c) recommending reserves to pay covered losses; (d) retaining and utilizing experts, such as building consultants, to assist in identifying covered building damage repairs and the cost of such repairs; (e) determining the appropriate amount of money Chubb should pay to settle a covered loss; and (f) authorizing and recommending claim settlement payments on the assessed loss according to the terms of the governing policy."  [¶ 18]

- "In performing these tasks, Sorge was required to document the claim file with pertinent information relating to the loss and its adjustment.  Among other things, the claim file should include photographs of both the damaged dwelling and contents, the status of the ongoing restoration project, identification of consultants or contractors retained by Chubb to assess or remediate the dwelling or contents, relevant information of the insured's

contractors for such restoration, and clear documentation of amounts paid under the Chubb policy." [¶ 19]

- "Chubb made claim payments [totaling approximately $10,000,000.00] in reliance upon…Sorge's actual and implied representations that the amounts in Mertz's estimates were good faith, fair market estimates provided by an independent building consultant." [¶ 159]

- "Sorge breached his fiduciary duty by failing to properly discharge his duties, by failing to disclose to his superiors that Mertz was either seeking to become the insureds' contractor or had become the contractor while acting as a Chubb building consultant, by failing to question fraudulent estimates submitted by Mertz, by recommending claim payments based on Mertz's fraudulent estimates, by allowing Mertz to be paid as both Chubb consultant and insureds' contractor on the same loss, and by allowing Mertz to steal from Chubb in the ways described above."  [¶ 168]

Contrary to the Debtor's assertion, even if this Court looks beyond the conclusive nature of the Verdict, Federal has provided ample factual allegations of the Debtor's fiduciary capacity.  Federal's allegations make clear that the Debtor was a senior claims adjuster entrusted with complete authority and discretion to pay substantial claims, with control over Federal's funds, and in whom Federal entrusted its funds for payment of only valid, covered claims in verified amounts.  Federal has thus specifically alleged that the "property of one person [was] placed in charge of another" and that the Debtor "handl[ed] funds which ha[d] been entrusted to him to be applied to a specific purpose."  *Hamby*, 217 F.2d at 80.

## V.   Federal's Count I States a Valid Claim to Exempt the Jury's Fraud Verdict From Discharge Pursuant to Section 523(a)(2)

The Debtor again creatively seeks to avoid the consequences of the jury's finding of his actual fraud by arguing that Section 523(a)(2) requires an express finding that the Debtor "gain[ed] something from the fraud."  [Memo of Law, p. 9]  First, the Debtor is barred from relitigating this issue when he specifically raised it as a defense in the New York Action.  Second, this Court can infer that the Debtor "gain[ed] something from the fraud," from the jury's Verdict.  Third, closely analogous Fourth Circuit authority clarifies that, on these facts, an

express finding of benefit is not necessary.  Finally, if necessary, Federal has pled ample facts which support the conclusion that the Debtor received significant sums of money from his fraud.

> **a.  The Debtor is collaterally estopped from arguing that he received no "benefit" from his actual fraud**

Section 523(a)(2) does not require any showing of actual benefit to the Debtor, and the Court need not reach that issue.   Moreover, the Debtor may not now argue that he did not benefit from his fraudulent scheme.  Both the Debtor and Federal specifically raised that issue and it was presented to the jury in the New York Action.  Among the Debtor's defenses presented to the jury in the Jury Charge was that "he did not financially profit from his alleged role."  [McTaggart Dec. Ex. 5, p. 23]  Despite this specific defense, the jury found the Debtor liable for actually defrauding Federal by clear and convincing evidence.  The issue of his "financial[] profit" is precisely the issue which the Debtor now raises in his Motion to Dismiss in this case.  As a result, the Debtor may not relitigate that issue in this case and this Court should disregard it.

Moreover, this Court must recognize the Debtor's position for what it is:  a request that this Court conclude that the Debtor actually defrauded Federal, as the jury found by clear and convincing evidence, on a whim and without any personal motivation or perceived benefit whatsoever.  That position is incredible.  Fortunately, the "deductive approach" empowers this Court to draw logical conclusions from the Verdict.  *In re Kates*, 485 B.R. at 102.  Where the Verdict was rendered after the jury was specifically instructed of the Debtor's defense that he did not "financially profit from his alleged role," this Court should conclude that any issue of the Debtor's perceived benefit is foreclosed by the Verdict.

**b.** **The jury's actual fraud finding is sufficient to establish a nondischargeable debt**

Assuming he is not barred from raising it, and even assuming he defrauded Federal for no gain, Debtor's substantive argument is wrong. Section 523(a)(2) "is broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor." *In re Pleasants*, 219 F.3d 372, 375 (4th Cir. 2000).

In *Pleasants*, homeowners filed a fraud claim against the debtor in state court relating to the debtor's misrepresentation that he was a licensed architect and to subsequent damage to their home. *Id.* at 374. When the debtor filed his bankruptcy case prior to trial, the homeowners sought to have their claim against the debtor determined to be nondischargeable. *Id.* The bankruptcy court found the homeowners' $1,262,296 claim nondischargeable pursuant to Section 523(a)(2). *Id.* at 375. Significantly, "none of the [homeowners'] claim was for consideration directly transferred to [the debtor]. Rather, the [homeowners'] claim included only amounts paid by the [homeowners] to third parties, such as payments to the architect and builder hired to correct and complete the project." *Id.* On appeal, the debtor made precisely the argument the Debtor presents in this case: that Section 523(a)(2)'s "language requires that some portion of a creditor's claim must have been directly transferred from the creditor to the debtor." *Id.*

The Fourth Circuit held that the debtor's "argument is misplaced," since the United States Supreme Court had clearly stated "that § 523(a)(2)(A) prevents the discharge of <u>all</u> liability <u>arising from</u> fraud." *Id.* (emphasis in original) (quoting *Cohen v. de la Cruz*, 523 U.S. 213, 215 (1998)). The *Cohen* Court also stated that Section 523(a)(2)(A) bars "discharge of debts <u>resulting from</u> or <u>traceable to</u> fraud." 523 U.S. at 218. The Fourth Circuit in *Pleasants* expressly held that "this language is broad enough to encompass a situation in which no portion

18

of a creditor's claim was literally transferred to the fraudulent debtor."  219 F.3d at 375.  Any other holding would be inconsistent with *Cohen*, and "if it were otherwise, the Bankruptcy Code's objectives would be ill served" by allowing fraudsters "to hide behind the skirts of the Bankruptcy Code."  *Id.*

In *Pleasants*, the Fourth Circuit found a debt nondischargeable where the debtor's claim was not based on any transfer of money to the debtor, but where the debtor's fraud caused the creditor to transfer money to third parties.  Assuming that the Debtor is entitled to relitigate the specific issue he raised to the jury in the New York Action, and even taking the Debtor's position as true, this case is closely analogous to the facts of *Pleasants*.  The Debtor asserts that he did not receive any money directly, but the Debtor's fraud caused Federal to transfer unearned money to the Debtor's co-schemers and co-defendants Mertz via its insureds.  Because these facts align with the specific fact pattern addressed in *Pleasants*, and the *Pleasants* Court rejected precisely the argument now advanced by the Debtor, *Pleasants* should control and this Court should conclude that no actual benefit must have been received by the Debtor to support a nondischarge judgment.

> **c.    The Debtor's reading of *Rountree* is too narrow, that decision is readily distinguishable, and limited to its unique facts**

The holding of *Nunnery v. Rountree*, 478 F.3d 215 (4th Cir. 2007), is limited to its extremely unique facts.  In 1991, Pamela Nunnery was involved in a car wreck and filed a personal injury lawsuit against Eric Baucom in state court.  *Id.* at 217.  June Rountree, an unlicensed private investigator hired by Baucom's insurer, "befriended Nunnery," "convinced her to attempt activities in which Nunnery was reluctant to participate because of her injuries," then "videotaped Nunnery water skiing, jet skiing, riding horses, [etc.]"  *Id.* at 218.  Baucom's insurer then used the videos in the litigation.  *Id.*  Nunnery then sued her former friend Rountree and a

jury awarded her "compensatory damages for emotional distress" and "punitive damages."  *Id.*  The bankruptcy court concluded that Nunnery's emotional distress judgment sufficiently proved all elements of fraud, and held her claim against Rountree to be nondischargeable under Section 523(a)(2)(A).  *Id.*  On appeal, Rountree argued that she had obtained nothing from her fraud.

The *Rountree* Court acknowledged the holding in *Pleasants* that Section 523(a)(2)(A) "is broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor," and it recognized the language of *Cohen* cited in *Pleasants*.  *Id.* at 221.  However, based on the unique fact pattern and that "[n]either side disputes…that Rountree obtained nothing directly or indirectly from Nunnery as a result of her fraud," the *Rountree* Court found Section 523(a)(2)(A) inapplicable to Nunnery's emotional distress judgment.  *Id.* at 222.  The *Rountree* Court did distinguish *Pleasants*, without seeking to undermine its holding, on the grounds that, in *Pleasants*, the homeowners did pay the debtor money for architectural services and that "the [homeowners] lost money" as a result of the debtors' fraud.  *Id.*

Unlike *Pleasants*, which is closely analogous to these facts even if the Debtors' position is taken as true, *Rountree* was decided on unquestionably peculiar facts not remotely comparable to this case.  The holding of *Rountree* should not guide the Court in this case because:

- As stated above, the facts are completely different and unquestionably atypical.

- The creditor in *Rountree* had a judgment for emotional distress based on the debtor's emotional deceit and betrayal.  The relationship between the creditor and debtor, and the cause of the underlying judgment, had nothing whatsoever to do with money, property, or

transfers. Here, Federal's judgment is for actual fraud based on the Debtor's knowingly wrongful transfer of Federal's money.

- The *Rountree* Court distinguished *Pleasants* based on its reading of COLLIER ON BANKRUPTCY. *Id.* at 222, fn.1. However, the section of COLLIER cited by *Rountree* provides only that "the debtor's fraud must result in a loss of property to the creditor." *Id.*, fn.1 (quoting COLLIER ON BANKRUPTCY ¶ 523.08[1][b] (5th ed. rev. 2004)). In this case, there is no doubt that the Debtor's fraud "result[ed] in a loss of property to [Federal]" where the jury found the Debtor liable for paying Federal's funds to Mertz for false claims and awarded Federal some $2,700,000 in damages including interest.

To the extent that the rationale of *Rountree* is deemed applicable to this action, *Rountree* would require only a showing of <u>some</u> benefit to the debtor, even an "indirect" one. *Id.* at 222 ("requires that the debtor have obtained something from the creditor…"; "Rountree obtained nothing directly or indirectly…"). Unlike the debtor in that case, here the Debtor obtained nearly $1,000,000 in compensation from Federal, substantial kickbacks from Mertz for his role in the scheme, and the Debtor controlled Federal's funds through his authority as a senior claims adjuster and misapplied those specific funds to an improper and unauthorized use, the payment of false claims. As a result of the Debtor's wrongful actions, the Debtor did "obtain[] something" and Federal most certainly "lost money." *Id.* at 222. Those facts support the conclusion that, even if *Rountree* applied, its standard is met on these very different facts.

### d.    In the alternative, Federal has pled ample facts in support of its claim that the Debtor obtained a monetary benefit from his proven fraudulent actions

Even if this Court were to look past the conclusive effect of the jury's finding that the Debtor actually defrauded Federal and was paid for his services, and now require that Federal plead and reprove that the Debtor benefited and profited from the fraud, Federal's claims are not

21

subject to dismissal because, contrary to the Debtor's assertion, Federal has pled ample factual

allegations that the Debtor benefitted and profited from his fraud.

First, the Debtor overlooks the following allegations in the Amended Complaint,

which specifically explain the Debtor's benefit from his fraud:

- Ultimately, Federal paid its insureds more than $20 million to settle the eight insurance claims identified in the New York Action Complaint, including more than $10 million to demolish and repair the fire-damaged property based on the Mertz estimates. The insureds, in turn, paid Mertz approximately $9.3 million from that amount for work that Mertz did at their homes. Mertz, in turn, shared the insurance proceeds with Sorge through kickbacks. [Am. Comp. ¶ 23]

- In fact, during some years, Sorge deposited more than his net income in his bank accounts after accounting for the aforementioned expenses. During the period from 2007 to 2010, Sorge deposited approximately $900 less than his net income. In other words, Sorge only had that amount of known funds to pay for living expenses other than housing, utilities, taxes and miscellaneous costs. This was possible because, in addition to his compensation from Federal, Sorge was paid kickbacks and bribes by Mertz and other vendors who did work at damaged homes that were insured by Federal. Sorge used the kickback and bribe money to fund his other living expenses. [*Id.* ¶ 31]

- Between 2005 and 2011, Sorge contributed the maximum to his 401(k) account, applying more than $125,000 of his gross compensation to a Federal employee retirement account. In August 2011, Sorge rolled over the entirety of his Federal retirement account into IRA accounts at Chase and an annuity purchased from Pacific Life through his Chase broker. The entirety of those funds, including all gains from 2005 to the present, remain in the annuity and IRA accounts held at Chase. [*Id.* ¶ 32]

Second, pleadings and evidence from the New York Action, which supported the

jury's finding of the Debtor's actual fraud, reveal the Debtor's benefit from his fraud. In the New

York Action, the Debtor stipulated to the below amounts of net income and deposits, showing

that, from 2007 to 2010, the Debtor's deposits only left $800.00 for four years' worth of food,

clothing, travel, entertainment, and other incidental and living expenses.

| | **2007** | **2008** | **2009** | **2010** | **2007-2010** |
|---|---|---|---|---|---|
| **Net Income** | $69,056.83 | $78,491.47 | $79,192.14 | $80,172.42 | **$306,912.86** |

| **Deposits** | $67,710.41 | $79,164.38 | $85,084.35 | $74,144.67 | **$306,103.81** |
|---|---|---|---|---|---|

[McTaggart Dec., Ex. 3]   Likewise, Mertz testified that, although a tally sheet in his own handwriting for the McAlley claim states that he paid someone 10% of the $2,300,000.00 that he received on that claim, he could not explain his handwritten note.  [McTaggart Dec., Exs. 7-8]

Based on the foregoing, in the event that this Court requires Federal to relitigate issues relating to the Debtor's actual fraud, Federal has pled ample facts to support the conclusion that the Debtor received a benefit from his intentional, fraudulent scheme.

e.    **In the alternative, the jury's finding of the Debtor's actual fraud relating to the Iddison claim also constitutes a fiduciary defalcation or embezzlement and is additionally non-dischargeable pursuant to Section 523(a)(4)**

Additionally, the jury's finding that the Debtor committed actual fraud relating to the Iddison claim is sufficient to determine that debt nondischargeable as fiduciary defalcation or embezzlement pursuant to Section 523(a)(4), which has no "benefit" requirement.  As stated above, the jury necessarily determined that the Debtor stood in a fiduciary relationship with Federal as a result of his duties, discretion, and authority.  The jury's finding as to the Debtor's actual fraud relating to the Iddison claim likewise necessarily required the jury to find that the Debtor "pa[id] the insurance claims at issue in this case in amounts greater than it should have paid" and that the Debtor knowingly made false representations to Federal concerning those payments.  [McTaggart Dec. Ex. 5, p. 19]  Those findings establish fiduciary defalcation and embezzlement under Section 523(a)(4).  *Cobham*, 551 B.R. at 195 ("Defalcation is an intentional breach of trust and misapplication of funds.  The required intent element may be shown by either knowledge of, or gross recklessness in regard to, the improper nature of the relevant fiduciary

behavior"); *York*, 205 B.R. at 764 (defining embezzlement as "the fraudulent, or knowing and willful, misapplication or conversion of property which belongs to another").

## VI.    Federal Did Raise, and Continues to Pursue, Constructive Trust Relief in the New York Action, To Which This Court Should Defer

On June 21, 2013, Federal sought and obtained a TRO in the New York Action restraining, among other things, the Debtor's IRA accounts at JPMorgan Chase Bank.  That TRO later became an attachment that remains in place.  In seeking the TRO and attachment of the Debtor's IRA assets, Federal argued:

> Under the faithless servant doctrine, Sorge forfeited all compensation that Chubb paid him during the period of faithlessness. *See Phansalkar, L.P.*, 344 F.3d at 205. This amount exceeds $1 million. Sorge forfeited that money at the moment Chubb paid him, and, therefore, was required to return it to Chubb at the same time. *Id.* at 208. As Judge Sand pointed out in *US. v. Fontana*, 528 F. Supp. 137, 146 (S.D.N.Y. 1981), a constructive trust "arises when the duty to make restitution arises." This, in turn, means that Sorge only holds bare legal title to his Chubb compensation, including money that he placed in an IRA account or a protected annuity, and he holds that money in a constructive trust for Chubb.

[McTaggart Dec. Ex. 1, at 20]

Thus, the Debtor has known since June 2013 that Federal contends that the remedy for its faithless servant claim under New York law includes the impression of a constructive trust on his forfeited compensation.   In opposing Federal's motion for an attachment, the Debtor did not dispute this scope of relief.  [McTaggart Dec. Ex. 2]

The District Court subsequently granted Federal's motion for a writ of attachment that restrained the Debtor's IRAs.  Only now does The Debtor argue that a constructive trust is not a part of the relief to which Federal is entitled as the prevailing party on its faithless servant claim.  This dispute is being presented to Judge Nelson S. Román, who issued the writ of attachment and presided over the jury trial, as part of settling the judgment.  Federal respectfully

requests this Court to abstain from addressing the merits of the constructive trust dispute and defer to Judge Román to decide the scope of relief to which Federal is entitled.

Abstention is especially appropriate because the Debtor requested that the faithless servant claim not be submitted to the jury. The Debtor stipulated in open Court that if the jury found that he breached his fiduciary duty, then he would also be liable as a faithless servant. The Debtor further agreed that Judge Román would resolve all disputes concerning faithless servant damages and that the parties could submit additional evidence, as necessary, regarding those damages. At no time did the Debtor dispute the scope of the remedy to which Federal is entitled. [McTaggart Dec. Ex. 6] The Debtor ignores all of this in moving to dismiss Federal's conditional claim that asked this Court to resolve the constructive trust dispute but only if Judge Román did not.

Judge Román is in the best position to determine the scope of the relief to which Federal is entitled under New York law based on the record before him, including the consequences of the Debtor taking the faithless servant issue from the jury and his acquisition in Federal's contention regarding the scope of relief to which it is entitled. In addition, and to the extent necessary, under Rule 15(b), Federal Rules of Civil Procedure, Federal may move in the New York action to amend its complaint *nunc pro tunc* to explicitly demand constructive trust relief.[4] *See, e.g., Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986) (post-trial motions to conform pleadings "should be granted in the absence of such prejudice if the interests of justice so require").

---

[4]   This Court lifted the automatic stay to permit Judge Román to enter a judgment in the New York Action. Federal believes that this permits Judge Román to address an argument to amend the complaint to include a request for constructive trust relief. However, in an abundance of caution, Federal will ask this Court to issue an order making clear that the lift stay order permits Judge Román to address any and all issues and disputes related to the entry of a judgment.

The entry of a judgment that impresses the constructive trust sought by Federal on a portion of the Debtor's funds in his IRA account moots the Debtor's *res judicata* and statute of limitation arguments made in his motion to dismiss the adversary complaint. Moreover, as further discussed in the following section, the Debtor's arguments as presently made are not ripe for adjudication because no one knows what will be the posture of Federal's constructive trust claim in this Court in the unlikely event that Judge Román determines not to decide the dispute before him.

For these reasons, this Court should abstain from addressing the constructive trust dispute and defer to Judge Román.

## VII.    The Debtor Seeks an Advisory Opinion Regarding his Constructive Trust Arguments

Federal conditionally pled its constructive trust claim in its Adversary Complaint because of the deadline by which Federal had to make known its claims. It specifically said that it raised that claim only to the extent it was not addressed by the District Court in the New York Action. Until that Court rules, the contours of Federal's claim in this Court, if necessary, will not be known. The Debtor ignores this in his motion to dismiss that portion of Federal's adversary complaint. He speculates regarding what the claim might be, and then creates straw arguments for dismissal.

This Court should not render an advisory opinion addressing those straw arguments. Rather, it should wait until it is known whether Judge Román has resolved the issue, or whether this Court must address it, and in what form and context. *See, e.g.*, *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S. Ct. 2026, 2030, 155 L. Ed. 2d 1017 (2003) (dispute not ripe "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action"). "[C]entral to the

ripeness requirement is that courts should not endeavor to resolve contingencies that may or may not occur as expected or may not happen at all." *Dow Jones & Co. v. Harrods, Ltd.,* 237 F. Supp. 2d 394, 407 n. 39 (S.D.N.Y. 2002), *citing Thomas v. Union Carbide Agric. Prod. Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), *aff'd,* 346 F.3d 357 (2d Cir. 2003). Thus, until Judge Román rules, this Court, respectfully, can do no more than issue an advisory opinion regarding the constructive trust claim, and this it may not do.

## VIII.   Federal Should Not Be Required to Address Debtor's Straw Arguments

Federal respectfully requests that the Court defer any response to the Debtor's arguments as to the constructive trust claim until after Judge Román rules.  Only then will the parties be in a position to know whether there is anything for this Court to address, and, if so, the nature and scope of the constructive trust dispute that must be resolved by this Court.[5]

### CONCLUSION

For the reasons set forth herein, the Debtor's Motion to Dismiss should be denied.

---

[5] The Debtor does not contest Federal's Fourth Claim for Relief that the forfeited funds in the IRAs do not have any protection under North Carolina exemption law.  Therefore, Federal does not address this issue.  However, Federal points out that whether the forfeited funds are property of the Debtor's estate turns on who holds equitable title to those funds.  The Debtor asserts that his IRAs are exempt assets.  For estate property purposes, this means that he must hold both legal and equitable title to the funds.  11 U.S.C. § 541(d).  However, because of the forfeiture required by faithless servant liability, he only holds bare legal title to the funds and Federal holds equitable title.  Under these circumstances, the Debtor has no valid exemption with respect to funds that he must forfeit.  *See, e.g., In re Pardee*, 433 B.R. 377, 388-89 (Bankr. N.D.Ok. 2010).  Federal will further address this matter in its opposition to the Debtors motion to strike Federal's objection to his exemptions.

This the 15th day of December, 2016.

/s/ Paul A. Fanning_____

Paul A. Fanning
N.C. State Bar I.D. No.: 025477
E-mail: paf@wardandsmith.com
For the firm of
Ward and Smith, P.A.
120 West Fire Tower Road
Post Office Box 8088
Greenville, NC 27835-8088
Telephone:  (252) 215-4000
Facsimile:  (252) 215-4077

-and-

/s/ William B. Pollard, III_____

William B. Pollard, III
New York State Bar I.D. No.: 1237767
E-mail: wbpollard@duanemorris.com
For the firm of
Duane Morris LLP
1540 Broadway
New York, NY 10036
Telephone:  (212) 692-1043
Facsimile:  (212) 202-4931

Attorneys for Federal Insurance Company, Great Northern
   Insurance Company, and Pacific Indemnity Company

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS was filed electronically in accordance with the local rules and was therefore served electronically on those entities that have properly registered for such electronic service.  Entities not registered for electronic service have been served by depositing a copy thereof in the United States mail, postage pre-paid.

Dennis P. Sorge
825 Stadium Drive, Apt. G
Wake Forest, NC 27587

Trawick H. Stubbs, Jr.
William H. Kroll
Stubbs & Perdue, P.A.
9208 Falls of Neuse Road, Suite 201
Raleigh, NC 27615
*counsel for Defendant, Dennis P. Sorge*

This the 15th day of December, 2016.

*s/ Michael J. Parrish*
Michael J. Parrish
N.C. State Bar I.D. No.:  38419
email:  mjp@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 867
New Bern, NC  28563-0867
Telephone:  252.672.5400
Facsimile:  252.672.5477
Attorneys for Federal Insurance Company, Great Northern
  Insurance Company, and Pacific Indemnity Company